**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| UNITED PARCEL SERVICE, INC., § <br> UNITED PARCEL SERVICE CO., § <br> UNITED PARCEL SERVICE GENERAL § <br> SERVICES CO., and § <br> UPS WORLDWIDE FORWARDING, INC. § <br> § <br> PLAINTIFFS, § <br> § CIVIL ACTION NO. 3:12-CV-561-S <br> v. § <br> § <br> AIR TRANSPORT INTERNATIONAL LLC § <br> § <br> DEFENDANT. § | |

## AMENDED COMPLAINT

For their Amended Complaint, the Plaintiffs United Parcel Service, Inc. ("UPS Inc."), United Parcel Service Co. ("UPS Co."), United Parcel Service General Services Co. ("UPS GS"), and UPS Worldwide Forwarding, Inc. ("UPS Worldwide") (collectively, the "UPS Plaintiffs"), hereby state and allege as follows:

## PARTIES

1. Plaintiff UPS Inc. is an Ohio corporation which conducts business regularly in Kentucky. Its parent company is UPS Worldwide (whose own parent company is United Parcel Service of America, Inc. ("UPS America")).

2. Plaintiff UPS Co. is a Delaware corporation which conducts business regularly in Kentucky. Its parent company is UPS America.

3. Plaintiff UPS GS is a Delaware corporation which conducts business regularly in Kentucky. Its parent company is UPS America.

4. Plaintiff UPS Worldwide is a Delaware corporation which conducts business regularly in Kentucky. Its parent company is UPS America.

5. Defendant Air Transport International, LLC ("ATI") is a Nevada limited liability company and charter airline with a principal place of business at 2800 Cantrell Road, Little Rock, AR 72202, and which conducts business regularly in Kentucky.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the jurisdictional minimum and there is complete diversity of citizenship between the parties. Further, the parties are governed by a Cargo Aircraft Charter Agreement wherein they consented to personal jurisdiction in Kentucky and agreed that the laws of the Commonwealth of Kentucky would govern the contract. (*See* Cargo Aircraft Charter Agreement (the "CACA"), attached as Ex. A, at § 8.4).

7. Venue is proper in this Court under 28 U.S.C. § 1441(a) in that the United States District Court for the Western District of Kentucky, Louisville Division, is the District Court embracing Jefferson County, Kentucky, the location in which the UPS Plaintiffs initially filed this civil action, and the District Court to which ATI removed this civil action.

## THE CARGO AIRCRAFT CHARTER AGREEMENT

8. On August 11, 2005, UPS Worldwide and ATI executed the CACA, pursuant to which ATI, as an independent contractor, would provide UPS Worldwide with "one (1) or more properly crewed, maintained, insured and equipped aircraft . . . for the carriage of UPS's freight." (*See* CACA Preamble & § 1.1).

9. In Section 1.3 of the CACA, ATI agreed to provide "Complete maintenance, overhaul and repair of the Aircraft as necessary to keep the Aircraft in an airworthy condition."

10. Pursuant to Section 5.1 of the CACA, the CACA's terms commenced on August 11, 2005, and remained in effect on December 21, 2007.

11. ATI agreed to defend and indemnify UPS from and against any damages and any lawsuit arising out of its services; specifically, Section 1.4 of the CACA provides, in pertinent part:

> 1.4 [ATI] hereby agrees **to indemnify, defend, and release and hold harmless UPS** and its officers, directors, agents and employees **against any and all liabilities, claims, demands, suits, judgments, damages and losses, including the reasonable costs, expenses and legal fees in connection therewith or incident thereto, arising out of** death or **injury to any person whomsoever, including but not limited to employees of [ATI]** or UPS, or arising out of loss of, damage to or destruction of any property whatsoever, including but not limited to cargo, the Aircraft and other property of UPS or third parties, **to the extent caused by or arising out of or in any way connected with [ATI]'s performance of services hereunder** or its possession, use or maintenance of Aircraft utilized to provide such services, excluding however injury or damage caused by the willful misconduct or gross negligence of UPS or its subcontractors.

(Emphasis added).

12. Section 1.9 of the CACA specifies that ATI's obligations under Section 1.4 extend to UPS Worldwide's "parent United Parcel Service of America, Inc. and its affiliated companies, and the officers, directors, agents and employees of each of those companies."

## THE UNDERLYING ACTION, AND THE UPS PLAINTIFFS' TENDER TO ATI

13. On December 18, 2009, Plaintiffs Gary M. DeVaco and Peggy J. DeVaco (the "DeVacos") initiated an action against, among others, the UPS Plaintiffs (except UPS Worldwide) for negligence, personal injuries, and loss of consortium in the Pennsylvania Court of Common Pleas of Philadelphia by virtue of a Writ of Summons and a Complaint which they filed and served on July 6, 2010 (the "Underlying Action"). (*See* Court of Common Pleas docket, attached as Ex. B).

14. The DeVacos alleged that Mr. DeVaco "was employed by Air Transport International as of December 2007" during the period "ATI contracted with UPS to transport some

3

of UPS' overflow of packaging and cargo for a short period," that Mr. DeVaco and another ATI employee, Kevin Waldron, "were mechanics who were to service an ATI aircraft that was delivering UPS packaging and cargo" to the UPS terminal at the Philadelphia International Airport, and that, while Mr. DeVaco and Mr. Waldron waited in the ATI van for the arrival of the ATI aircraft, jet blast from a taxiing UPS Boeing 747 caused the van to turn over on its side and be pushed several feet, causing injury to Mr. DeVaco (the "Underlying Accident"). (DeVaco Amended Complaint, attached as Ex. C, at ¶¶ 39-40, 42, 50-51).

15. The DeVacos asserted 25 different theories against the UPS Plaintiffs', which include, *inter alia*, the following: failure to properly escort Mr. DeVaco and failure to remain with Mr. DeVaco (*id.* at ¶ 57(a),(c)); failure to communicate to Mr. DeVaco and other ATI employees the taxiing and parking schedule of aircraft (*id.* at ¶57(d)); failure to warn Mr. DeVaco that "a UPS Boeing 747 Aircraft would be maneuvered, moved, stopped, and turned directly in front of him and his vehicle (*id.* at ¶ 57(e); failure to adequately monitor the movement of UPS aircraft in relation to the parked ATI vehicle (*id.* at ¶ 57(f)); and failure to adequately communicate to one another the risks and hazards exposed to the ATI vehicle (*id.* at ¶ 57 (p)).

16. Because the DeVacos' claims arose out of and were connected to ATI's performance of services -- e.g., maintenance -- pursuant to the CACA, by letters dated July 19, 2010, September 16, 2010, and October 8, 2010, UPS Plaintiffs tendered their demand that, pursuant to Section 1.4 of the CACA, ATI defend and indemnify them from and against the DeVaco's claims in the Underlying Action. (*See* Letters of 7/19/10, 9/16/10, 10/8/10, attached respectively as Exs. D, E, and F).

## ATI RETAINS SALMON, RECCHEZZA, SINGER AND TURCHI AS COUNSEL AND INVESTIGATES THE UPS PLAINTIFFS' TENDER

17. On September 29, 2010, George Golder, a licensed attorney who also acted in the capacity as Vice-President and General Counsel for ATI, forwarded UPS Plaintiffs' October 28, 2010 tender to ATI's commercial insurance broker. (*See* 9/29/10-10/6/10 Email string, attached as Ex. G).

18. On September 30, 2010, the commercial insurance broker sent Golder's email that forwarded UPS's second tender to Chartis Aerospace Insurance Group ("Chartis"), who was the lead insurer for ATI. (*See id.*).

19. The commercial insurance broker also wrote to Chartis: "ATI had a minor slip and fall claim some time ago which AIG adjusted and you assigned Salmon, Recchezza, Singer and Turchi [(the "Salmon Firm")] as counsel. Mr. Golder worked with Zach Ballard with that firm and, if possible, would like to have them assigned on this situation." (*Id.*).

20. On October 4, 2010, Steve Allen, in his capacity as "Claims Attorney" and on behalf of Chartis wrote:

> Regarding approved panel counsel, I have also worked with Salmon, Recchezza, Singer & Turchi, with great results. By happenstance, I am actually meeting with Jay Salmon, Mark Dianno and Zachary Ballard in my office today. I highly recommend we retain this firm and will request they perform the customary conflict check.

(*Id.*).

21. On October 5, 2010, Allen wrote to Jay Salmon the following:

> I have two cases for your firm and I am hoping that you can run the conflict checks today. The first case is the UPS matter we discussed earlier. UPS is seeking indemnification (under contract) from our insured, Air Transport International. The plaintiffs are Gary and Peggy DeVaco. The Named Defendants are UPS and City of Philadelphia. The suit was filed in the Philadelphia County Court of Common Pleas in December 2009. Plaintiffs' counsel is Doig and Doig. Our claim number is TBD.

(10/6/10 Email string, attached as Ex. H).

5

22. Minutes after receiving Allen's note, Salmon replied to Allen: "I've cleared the UPS case. Still working on the other one." (*Id*.).

23. Allen then responded and forwarded Salmon "all the related correspondence." (*Id*.).

24. Minutes after Allen received the note from Salmon, Allen wrote to Golder: "I have asked Salmon, Ricchezza, Singer and Turchi to run a conflict check. I just received word from Jay Salmon that there is no conflict and have retained them as counsel for this matter." (9/29/10-10/6/10 Email string, Ex. G).

25. Minutes after receiving "all the related correspondence" from Allen, Salmon wrote to Philip J. Meyer, another attorney employed by the Salmon Firm: "Here's what I have." (10/6/10 Email string, Ex. H).

26. After receiving "all the related correspondence" from Salmon, approximately one hour later, Meyer prepared and sent the following opinion by email to Salmon:

> I reviewed the indemnification clause in the Cargo Aircraft Charter Agreement between UPS and ATI. Article 1.4 contains mutual indemnification agreements which require ATI and UPS to each defend and indemnify the other for bodily injury, specifically including injury to ATI's employees, "to the extent caused by or arising out of or in any way connected with" their respective performance of services under the Agreement or their possession, use or maintenance of Aircraft utilized to provide such services. The clauses exclude indemnification only for injury caused by the indemnitee's willful misconduct or gross negligence.
>
> Because the agreement specifically includes injuries to ATI's employees, ATI would not be protected by Workers Comp immunity. However, the Pennsylvania Supreme Court has held that the "to the extent caused by" language requires indemnification only for the indemnitor's share of responsibility for the plaintiffs injuries, even where the indemnification agreement also purports to provide indemnification for the indemnitee's own negligence. Greer v. City of Phila., 795 A.2d 376 (Pa. 2002). <u>Therefore, a good argument can be made that, at most, ATI would be obligated to indemnify UPS only for ATI'S percentage share of responsibility for plaintiffs damages. Furthermore, because UPS is required to indemnify ATI for injuries caused by UPS' operations under the Agreement, their respective indemnity obligations should cancel each other out. Therefore, I would recommend that ATI decline the tender</u>. . . .

6

(*Id.*) (emphasis in original).

27. On October 12, 2010, Meyer prepared and forwarded to Salmon a memorandum titled, "Indemnification and Insurance Issues." (10/12/10 Memo, attached as Ex. I).

28. In his October 12, 2010 memorandum, Meyer wrote, among other things, what is currently ATI's central theory of avoiding any responsibility to defend or indemnify UPS: "There would be no indemnity obligation if UPS' pilot was guilty of gross negligence." He also wrote that, "At most, ATI would be obligated to indemnify UPS only for ATI's percentage share of responsibility for DeVaco's damages," and reiterated that "Therefore, I would recommend that ATI decline the tender at this time." (*Id.*).

29. On October 12, 2010, Meyer, Allen, Salmon and an unknown "ATI representative" conducted a telephone conference regarding "contractual indemnification issues." (Salmon Firm billing invoices, attached as Ex. J).

30. On October 19, 2010, Salmon had a conference call with Allen. (*See* Salmon Firm billing invoices).

31. On the same day, Salmon forwarded Meyer's October 12, 2010 memorandum to Golder and Allen, and wrote "Things have changed after a review of Kentucky law." (10/19/10-10/20/10 Email string, attached as Ex. K).

32. On October 20, 2010, Golder wrote to Salmon and Allen:

> Well done memo. Thanks. We should explore with ATI what UPS actually had to do under the agreement. If they were responsible for allowing ramp access to our guys (as a practical matter, whether stated explicitly in the agreement as their obligation or not), would that give us grounds for claiming that their indemnity applies?
> . . . .
> I don't know how hard you would want to challenge their claim that we're responsible for indemnifying them, but we are okay pressing that point if you feel it is worthwhile.

7

(*Id.*).

33. On January 18, 2011, Salmon and Allen had a meeting that lasted one-and-a-half hours. (*See* Salmon Firm billing invoices, attached as Ex. J).

34. The following day, at ATI's request, ATI was permitted to conduct a site inspection of the subject UPS premises on January 19, 2011 in order to assist with its determination as to whether it would accept the UPS Plaintiffs' tender.

35. According to a January 20, 2011 memorandum authored by Zachary Ballard of the Salmon Firm, along with Ballard himself, ATI representatives named Brian and Jim, Steve Allen, and Keith Bergman of Fleisher Forensics attended the January 19, 2011 site inspection. (*See* 1/20/11 Memo, attached as Ex. L).

36. The site inspection lasted approximately five and a half hours. (*See* Salmon Firm billing invoices, attached as Ex. J).

37. During the January 19, 2011 site inspection, the above-listed ATI representatives, *inter alia*, viewed, inspected, photographed, and took measurements at the location where the Underlying Accident occurred.

38. After the January 19, 2011 site inspection, Ballard authored a memorandum dated January 21, 2011, titled "Review of Count IV of Plaintiff's Complaint Punitive Damages against UPS," which provided a detailed analysis of the DeVacos' gross negligence allegations/punitive damages claims against the UPS Plaintiffs. (*See* 1/21/11 Memo, attached as Ex. M).

39. On February 1, 2011, Ballard authored a legal memorandum titled "Summary of Plaintiff's Worker's Compensation File," which provided a detailed analysis of DeVaco's workers compensation claim(s) and proceedings related to the Underlying Accident. (*See* 2/1/11 Memo, attached as Ex. N).

40. On February 1, 2011, Ballard authored a second legal memorandum titled "Items to Be Completed," which contained a list of 18 tasks that the Salmon Firm contemplated completing with respect to UPS Plaintiffs' tender. (*See* Second 2/1/11 Memo, attached as Ex. O).

41. With no response from ATI or Chartis to the prior tenders, UPS Plaintiffs re-tendered their demand for defense and indemnity by letter dated February 8, 2011. (*See* 2/8/11 Letter, attached as Ex. P).

42. On February 10, 2011, Meyer made the following billing entry: "Legal research re: indemnitor's obligation to assume indemnitee's defense where complaint asserts claim that potentially falls beyond scope of indemnity agreement." Meyer billed 3.50 hours for his legal research and memorandum preparation. (*See* Salmon bills, attached as Ex. J).

43. On February 11, 2011, Meyer drafted a letter to Holland & Knight addressing the UPS Plaintiffs' third tender; it was never sent. (*See* Salmon bills, attached as Ex. J).

44. On February 14, 2011, Salmon wrote an email stating that "We are still considering the tender." (2/14/11 Email, attached as Ex. Q).

45. On March 14, 2011, Meyer, Allen and Salmon had a telephone conference call regarding the effect of the indemnification provisions of the CACA. (*See* Salmon bills, attached as Ex. J).

46. On March 17, 2011, Meyer conducted additional legal research regarding "indemnification for negligence of indemnified party" under Kentucky law. (*Id.*).

## ATI UNCONDITIONALLY ACCEPTS UPS PLAINTIFFS' TENDER

47. With no response from ATI to the prior tenders, the UPS Plaintiffs again re-tendered their demand for defense and indemnity by letter dated April 19, 2011. (*See* 4/19/11 Letter, attached as Ex. R).

48. By email from Jay Salmon dated April 25, 2011, ATI unconditionally, without any reservation of rights whatsoever, accepted the UPS Plaintiffs' tender by stating: "ATI will undertake the defense of UPS going forward in this litigation." (*See* 4/25/11 Email, attached as Ex. S).

49. ATI's acceptance was made with the advice of counsel, and with knowledge of the underlying facts of the Underlying Action, as well as the substance of and grounds for the claims asserted therein.

50. Between the April 25, 2011 date on which ATI accepted UPS Plaintiffs' tender and July 16, 2012, neither ATI nor Chartis ever sent UPS Plaintiffs a written reservation of rights under the CACA.

51. Between the April 25, 2011 date on which ATI accepted UPS Plaintiffs' tender and July 16, 2012, neither ATI nor Chartis ever communicated to UPS Plaintiffs -- whether verbally or in writing -- that they intended to reserve any rights under the CACA.

## ATI PROVIDES SALMON FIRM TO DEFEND UPS PLAINTIFFS

52. ATI, in turn, provided its own counsel, the Salmon Firm, to substitute in and defend the UPS Plaintiffs in the Underlying Action.

53. Upon information and belief, the Salmon Firm's invoices were paid for by ATI and/or its insurer, Chartis.

54. Neither ATI nor Chartis disclosed to UPS Plaintiffs the extent to which the Salmon Firm had advised ATI and/or Chartis regarding UPS Plaintiffs' tender, nor did they disclose to UPS Plaintiffs that the Salmon Firm had provided ATI and/or Chartis with the afore-mentioned October 12, 2010, opinion regarding the CACA's gross-negligence exception that "There would be no indemnity obligation if UPS' pilot was guilty of gross negligence."

10

55. On May 13, 2011, the Salmon Firm entered its appearance, and jury demand, on behalf of UPS Plaintiffs in the Underlying Lawsuit. (*See* Court of Common Pleas docket, Ex. T).

56. From that date until August 15, 2012, the Salmon Firm served as UPS Plaintiffs' defense counsel in the Underlying Action and controlled UPS Plaintiffs' defense therein.

57. UPS Plaintiffs relied upon ATI's unconditional acceptance of their tender, and allowed the Salmon Firm complete control of their defense in the Underlying Action.

58. UPS Plaintiffs were greatly prejudiced by the inappropriate acts and omissions of the Salmon Firm, on whom UPS Plaintiffs relied at all relevant times.

59. In light of the CACA's gross-negligence exception referenced in their afore-mentioned October 12, 2010, opinion that "There would be no indemnity obligation if UPS' pilot was guilty of gross negligence," the Salmon Firm handled UPS Plaintiffs' defense and reported to ATI and/or Chartis in ways that improperly prejudiced the UPS Plaintiffs' interests and furthered the interests of ATI and/or Chartis.

60. Neither ATI nor Chartis disclosed to UPS Plaintiffs that, between May 13, 2011 and July 17, 2012, the Salmon Firm exchanged numerous emails and letters, and had numerous telephone conferences and in-person conferences, with Allen of Chartis and Golder of ATI. (*See* Salmon bills, attached as Ex. J).

61. Neither ATI nor Chartis obtained UPS Plaintiffs' permission for the Salmon Firm's numerous communications with Allen and Golder.

62. On August 3, 2011, the court in the Underlying Action issued a Case Management Order establishing the following pertinent deadlines:

- Discovery completed by July 2, 2012;
- Defense expert reports submitted by August 6, 2012;
- All pre-trial motions filed by August 6, 2012;
- Pre-trial conference any time after October 1, 2012;

11

- Parties ready for trial by November 5, 2012.

(*See* Case Management Order of 8/3/11, attached as Ex. U).

63. On August 4, 2011, Ballard sent an email to UPS Plaintiffs summarizing facts provided to him by UPS Plaintiffs' personnel which would have been beneficial to UPS Plaintiffs' defense in the Underlying Action:

(a) Because DeVaco and Waldron had their own "SIDA" and TSA-approved badges there was no UPS escort involved in this accident as the ATI "employees would have been able to move throughout the UPS ramp on their own."

(b) "Subsequently, the ATI van was not parked in a designated parking area."

(c) "Additionally, ATI administers its own training in ramp safety which Plaintiff would have had to complete."

(d) "Further, the ATI/UPS contract required that all ATI employees comply with the UPS MX manual, including the safety provision pertaining to jet blast recognition/avoidance and general ramp safety."

(e) "Therefore, the decision to park the vehicle in the accident location was made by both occupants of the van as no UPS personnel were involved as escorts. No one from UPS assigned that spot for ATI to park."

(f) "After selecting the parking spot, the two ATI employees went inside the UPS Terminal, only returning to their vehicle when the B747-100 was creating jet wake, the ATI employees got inside the van."

(g) "Plaintiff, for unexplained reasons, went to the back of the van. He was injured when the truck flipped onto its side and an unsecured nitrogen bottle fell on him."

(h) "Failure to secure the nitrogen bottle is an OSHA violation in itself."

(8/4/11 Email, attached as Ex. V).

64. Unbeknownst to UPS Plaintiffs, on October 11, 2011, Salmon wrote a letter to Allen, purporting to provide "a status update in connection with [the Underlying Action]." (10/11/11 Letter, attached as Ex. W, at 1 & 6).

65. In the October 11, 2011 letter, Salmon once again noted several facts that would have been beneficial to UPS Plaintiffs' defense in the Underlying Action:

12

(a) "Plaintiff was a passenger in the back of the van during the incident. An unsecured nitrogen tank struck Plaintiff's head causing severe neck and head injuries."

(b) "One area of interest that will require further discovery is Plaintiff's behavior in the moments before the accident. According to Quinn, eyewitnesses saw the two mechanics exit their vehicle and enter the UPS facility near the B3 entrance."

(c) "As the UPS B747 approached, Jackie Kay saw the ATI mechanic run from the maintenance facility and jump back into the their vehicle—a move that UPS management believes is an indication that the mechanics knew their vehicle was not parked in an appropriate area."

(d) "Mr. DeVaco then got into the back of the maintenance van; an area that has no seats, no seatbelts and was cluttered with tools and equipment. Why Mr. DeVaco chose to get into the back of the van instead of the front, like Mr. Waldron, will need to be fleshed out during his deposition."

(*Id*. at 1 & 6).

66. Despite those favorable facts, Salmon's letter focused on facts adverse to UPS Plaintiffs, painted a one-sided negative liability picture, and ultimately concluded by telling Allen that, "[a]t this point in our investigation, liability looks considerably unfavorable" and, ignoring defenses plainly available to UPS Plaintiffs, that "[a]t best, we will be able to develop some minor theories of comparative negligence." (*Id*. at 6).

67. During the entire course of its representation of UPS Plaintiffs in the Underlying Action, the Salmon Firm did not develop any of the above-listed facts favorable to UPS Plaintiffs, or any available defenses.

68. The Salmon Firm did not engage or disclose a single liability expert on behalf of UPS Plaintiffs in the Underlying Action prior to the deadline for defense expert reports.

69. Unbeknownst to UPS Plaintiffs, on June 22, 2012, the Salmon Firm wrote another letter to Allen purporting to provide another "update regarding the liability picture relative to" the Underlying Action. (6/22/12 Letter, attached as Ex. X, at 1).

13

70. In the letter, the Salmon Firm once again painted a one-sided negative liability picture, and concluded by telling Allen that the evidence of record was "extremely unfavorable" to UPS Plaintiffs, that it was their "opinion that a jury would find UPS liable for Mr. DeVaco's accident," and, ignoring defenses plainly available to UPS Plaintiffs, that "[a]t this point, it appears that UPS does not have any liability defense available." (*Id*. at 1 & 11).

71. At Mr. DeVaco's June 25, 2012 deposition, neither Ballard nor Salmon asked Mr. DeVaco about topics that could have furthered UPS Plaintiffs' available defenses, including but not limited to:

(a) The importance of securing the nitrogen tanks from movement while transporting them, how the nitrogen tanks were secured in the subject ATI van, and whether Mr. DeVaco had any concern over the unsecured nitrogen tanks when he was in the back of the subject ATI van;

(b) OSHA, Philadelphia International Airport and Department of Transportation rules regulating transportation of nitrogen tanks;

(c) Witness accounts that Mr. DeVaco left the shelter of the UPS building and hurried to the subject ATI van;

(d) Witness accounts regarding the obviousness of the fact that Mr. DeVaco had parked in a jet blast area (e.g., his proximity to a pre-staged parking "T");

(e) The length of time that Mr. DeVaco was in the back of the ATI van;

(f) Questions that would have supported a foundation for an accident reconstruction expert liability opinion; or

(g) Questions that attacked DeVaco's credibility.

72. By letter dated July 17, 2012 -- 14 months and 23 days after ATI unconditionally accepted the UPS Plaintiffs' tender without any reservation of rights, and more than two weeks after the expiration of the discovery period in the Underlying Action -- ATI lead insurer Chartis informed the UPS Plaintiffs that it was revoking ATI's acceptance of the UPS Plaintiffs' tender. (*See* 7/17/12 Letter, attached as Ex. Y).

14

73. Chartis reaffirmed the purported revocation of ATI's acceptance of the UPS Plaintiffs' tender by letter dated August 9, 2012. (*See* 8/9/12 Letter, attached as Ex. Z).

74. The grounds for revocation stated in Chartis' letters substantially mirrored the Salmon Firm's afore-mentioned October 12, 2010, opinion regarding the CACA's gross-negligence exception that "There would be no indemnity obligation if UPS' pilot was guilty of gross negligence," as well as the negative picture painted in the Salmon Firm's October 11, 2011 and June 22, 2012 "update" letters to Allen of Chartis. (*Compare* Letters of 10/11/12 & 6/22/12 *with* Letters of 7/17/12 & 8/9/12).

75. Upon Chartis' purported revocation, upon information and belief, ATI and/or Chartis refused to give any settlement authority to the Salmon Firm for a mediation that was scheduled for August 2, 2012, and the mediation was cancelled.

76. By letter dated August 3, 2012, UPS Plaintiffs rejected Chartis's purported revocation but, notwithstanding that rejection, by letter dated August 6, 2012 -- 15 months and 13 days after ATI unconditionally accepted the UPS Plaintiffs' tender without any reservation of rights, and over a month after the expiration of the discovery period in the Underlying Action -- ATI informed the UPS Plaintiffs that it was revoking its prior acceptance of their tender. By letter dated August 22, 2012, UPS Plaintiffs rejected ATI's purported revocation. (*See* Letters of 8/3/12, 8/6/12, and 8/22/12 attached, respectively, as Exs. AA, BB, and CC).

77. By letter dated August 10, 2012, the Salmon Firm informed the UPS Plaintiffs that it had "been advised by Chartis that they will no longer pay for our services after Friday, August 17," and, in turn, that it would file a motion to withdraw as counsel immediately after a court-ordered mandatory August 15, 2012 settlement conference (for which, upon information and belief, ATI

and/or its insurer refused to give any settlement authority to the Salmon Firm). (*See* 8/10/12 Letter, attached as Ex. DD).

78. Before it withdrew as counsel, in a "Settlement Conference Memorandum" dated August 7, 2012, the Salmon Firm declared that UPS Plaintiffs "concede that the activities of its pilots, marshallers and escorts contributed to the occurrence of the accident," (*see* Settlement Conference Memorandum, attached as Ex. EE; this concession was made without UPS Plaintiffs' knowledge or permission.

79. As of the date of their initiation of this civil action, well after the close of discovery and mere months ahead of a trial-ready date in the Underlying Action, the UPS Plaintiffs were to their great prejudice faced with the revocation of a heretofore unconditional acceptance of an obligation to defend and indemnify them in the Underlying Action -- an acceptance upon which UPS Plaintiffs to their great prejudice at all relevant times relied.

80. Upon ATI's revocation, the UPS Plaintiffs were required to engage defense counsel who was unfamiliar with the case developments over the prior 15 months, and paid defense counsel attorneys' fees in the amount of $172,198.00 for approximately 590 total hours of work; both the number of hours worked and the total amount billed were reasonable and necessary under the circumstances.

81. After a mediation, the UPS Plaintiffs entered into a settlement of the Underlying Action whereby the DeVacos voluntarily dismissed their claims against UPS Plaintiffs with prejudice in exchange for UPS Plaintiffs' payment of Five Million Five Hundred Thousand Dollars ($5,500,000); the settlement amount was reasonable. (*See* Confidential Settlement Release excerpt, attached as Ex. FF).

82. On September 11, 2012, UPS Plaintiffs' invited ATI and Chartis to attend the above-referenced mediation at which the above-referenced settlement of the Underlying Action was reached; neither did.

83. The UPS Plaintiffs are faced with great uncertainty and insecurity as to their rights under the CACA, and a controversy of justiciable nature exists between the parties which requires a declaration by this Court of their respective rights.

<b><u>COUNT I</u></b><br><b><u>DECLARATORY JUDGMENT</u></b>

84. The allegations contained in Paragraphs 1-83 are re-alleged and incorporated herein by reference.

85. There is an actual, justiciable controversy between the parties as to their obligations under the CACA and, pursuant to KRS 418.040 and/or 28 USC § 2201, the UPS Plaintiffs request that this Court enter a declaratory judgment that:

(i) That the accident upon which the Underlying Action is based -- which the DeVacos allege occurred during the period "ATI contracted with UPS to transport some of UPS' overflow of packaging and cargo for a short period" and while Mr. DeVaco waited inside an ATI truck in order "to service an ATI aircraft that was delivering UPS packaging and cargo" (DeVaco Complaint at ¶¶ 39-40, 42, 50-51) -- was caused by, arises out of, and/or is connected with ATI's performance of services under the CACA;

(ii) That, pursuant to Section 1.4 and 1.9 of the CACA, ATI is required to indemnify and defend the UPS Plaintiffs in the Underlying Action and against any liability, judgment and/or damages incurred therein, including the reasonable costs, expenses and legal fees in connection therewith or incident thereto;

17

(iii) That, by its prior unconditional acceptance of the UPS Plaintiffs' tender of indemnity and defense pursuant to Section 1.4 of the CACA, without any reservation of rights whatsoever, and upon which the UPS Plaintiffs have relied, ATI has waived any claim, and/or is estopped from claiming, that it is not required to indemnify and defend the UPS Plaintiffs in the Underlying Action.

## COUNT II
## BREACH OF THE CARGO AIRCRAFT CHARTER AGREEMENT

86. The allegations contained in Paragraphs 1-85 are re-alleged and incorporated herein by reference.

87. By Sections 1.4 and 1.9 of the CACA, ATI is required to indemnify and defend the UPS Plaintiffs from and against any liabilities, claims, demands, suits, judgments, damages and losses, including the reasonable costs, expenses and legal fees in connection therewith or incident thereto, to the extent caused by or arising out of or in any way connected with ATI's performance of services under the CACA; this specifically includes defense and indemnity in the Underlying Action.

88. But for this and other related contractual covenants and promises, the UPS Plaintiffs would not have entered into the CACA.

89. Despite its approximately 15-month-long acceptance of its obligation under Section 1.4 of the CACA to defend and indemnify the UPS Plaintiffs in the Underlying Action, after discovery was complete and trial fast-approaching, ATI refused to meet that obligation.

90. By its refusal, ATI has breached the CACA, causing damages to the UPS Plaintiffs which exceed the jurisdictional threshold for this Court.

WHEREFORE, the UPS Plaintiffs hereby pray for the following relief:

(i) A jury trial on all claims susceptible to a trial by jury;

(ii) A declaratory judgment as set forth in Count I of the Complaint;

(iii) Compensatory and consequential damages totaling at least $5,500,000.00 in settlement monies paid and $172,198.00 in attorneys' fees incurred in the Underlying Action;

(iv) Prejudgment interest;

(v) Post-judgment interest;

(vi) Costs and fees in pursuing defense and indemnification hereunder, including reasonable attorney fees.

Respectfully submitted,

  /S/ Sarah M. McKenna
James T. Blaine Lewis
Sarah M. McKenna
DINSMORE & SHOHL LLP
2500 National City Tower
Louisville, KY 40202
        and
James H. Gordon (pro hac vice)
Roman T. Galas (pro hac vice)
ANSA ASSUNCAO, LLP
1600 JFK Boulevard, Suite 900
Philadelphia, PA 19103
*Counsel for Plaintiffs United Parcel Service, Inc., United Parcel Service Co., and United Parcel Service General Services Co., and UPS Worldwide Forwarding, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been sent to the attorney listed below, via electronic filing, in accordance with the Federal Rules of Civil Procedure on this 19th day of June, 2013:

Douglas B. Bates
STITES & HARBISON, PLLC
323 E. Court Avenue
P.O. Box 946
Jeffersonville, IN 47131-0946
Telephone: (812) 282-7566
Email: dbates@stites.com

Michael E. Kleinert
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400
Email: mkleinert@stites.com
*Counsel for Air Transport International LLC*

/S/ Sarah M. McKenna